# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TREY WOOLEY<br><br>v.<br><br>N&W MARINE TOWING, L.L.C., ROYAL CARIBBEAN CRUISES, LTD., M/V NICHOLAS, MAJESTY OF THE SEAS, STARR INDEMNITY & LIABILITY COMPANY, ASCOT (NATIONAL SPECIALTY INSURANCE) COMPANY, AND ABC INSURANCE COMPANY | CIVIL ACTION NO.: 2:20-cv-02390<br>c/w: 2:21-cv-00150<br><br>SECTION: T(1)<br><br>JUDGE: GUIDRY<br><br>MAGISTRATE: van MEERVELD<br><br>This pleading applies to all cases |

## CLAIMANT TREY WOOLEY'S PROPOSED FINDINGS OF FACT

Claimant Trey Wooley (hereinafter referred to as "Wooley" or the "claimant") proposes that the Court adopt the following findings of fact following the close of the limitation of liability trial set to begin on August 2, 2021:

### FINDINGS OF FACT

**I. The M/V NICHOLAS's role in causing the accident.**

1. The M/V NICHOLAS is owned by N&W Marine Towing, LLC ("N&W"). The M/V NICHOLAS is a 65 foot long, 30 foot wide, 43 foot high, 1,800 horsepower pushboat. On the morning of February 29, 2020, the NICHOLAS's barge tow consisted of four (4) 200 by 35 foot barges and two (2) 195 foot by 35 raked barges, placed at the bow of the tow. Overall, the tow was configured two-two-two, with a total length of 595 feet, and contained 8,800 tons of rock cargo. On the same morning, the N&W-employed crew on the NICHOLAS consisted of Captain Kevin Cole, Mate/Pilot Patrick Stewart, Lead Deckhand Michael Quinn, and Deckhand Jesse Osby.

2. The MAJESTY OF THE SEAS ("MAJESTY") is a cruise liner that was owned by Majesty of the Seas, Inc. and operated by Royal Caribbean Cruises, Ltd. ("RCCL"). On the morning of the subject incident, the MAJESTY was returning from a cruise in the Gulf of Mexico to the Port of New Orleans, when, in the early morning, near Pilottown it took on two compulsory pilots from the Crescent River Port Pilots Association — Philip Gandolfi and Richard Arnoult.

3. Stewart had been at the helm of the NICHOLAS since 7:00 am. Quinn described the two-two-two tow as the maximum tow that the NICHOLAS would push. The NICHOLAS did not use any connections to its tow other than the face wires — neither a headline nor wing wires. According to Stewart, the NICHOLAS never used wing lines and he has never considered doing so. When the NICHOLAS was faced up with its two face wires to the tow, as it was on February 29, 2020, all tension would have been on those two wires. According to Quinn, if a vessel uses wing wires and the face wires part, the tow will remain connected via the wing wires.

4. As the MAJESTY neared lower nine mile point, below the Meraux Fleet, Arnoult sighted the pushboat, M/V BUCKEYE STATE, and, at approximately 8:25 am, made radio contact with the BUCKEYE STATE to advise that the MAJESTY was astern coming upriver. The two vessels entered into an overtaking agreement several minutes later.

5. Earlier that morning, Captain Cole and Mate/Pilot Stewart decided to travel downriver of the Turn Services, LLC ("Turn" or "Turn Services") Fleet (Meraux) and top around the NICHOLAS's tow, to come back upriver and wait in line along the west bank for the Algiers Lock. At approximately 8:19 am, the Turn Services pushboat, M/V SHANE C, radioed the NICHOLAS and requested that the NICHOLAS "widen out" towards the middle of the river to allow the SHANE C to shift its crane barge to a different tier within Turn's fleet. Stewart was the only crewmember awake — thus, he was navigating the NICHOLAS, manning the radio, monitoring the vessels' AIS, and acting as lookout.

6. The NICHOLAS moved sufficiently towards the east bank, also cognizant of the SHANE C's position. There was no danger of the MAJESTY colliding with the NICHOLAS. As the MAJESTY approached the NICHOLAS, Stewart continued to believe that it was a safe overtaking and could be accomplished. Although he had the right to do so, Stewart did not change the terms of the overtaking at any time. Stewart had encountered cruise ships on the river before and was aware that they could produce some wake.

7. At approximately, 8:42 am, the MAJESTY was preparing to overtake the BUCKEYE STATE. At approximately 8:42:53, pilot Arnoult ordered the MAJESTY's engine pitch lever position to be moved from position "7" (slightly below "half ahead") to position "8" (slightly above "half ahead"). Arnoult ordered the increase in speed in order to increase steerage of the MAJESTY through the anticipated overtaking area between the NICHOLAS and the upper set of the Meraux buoys. The MAJESTY then successfully overtook the BUCKEYE STATE without incident.

8. At approximately 8:47 am, the MAJESTY began its overtaking of the NICHOLAS. This occurred near the Meraux Fleet area, approximately Mile 86-87 of the river. Stewart estimated that the MAJESTY was at least 300 feet away from the NICHOLAS towards the middle of the river channel. Stewart believed this was adequate room and he would have radioed the MAJESTY had he felt otherwise. Stewart did not radio the MAJESTY to address any speed or space issues.

9. There was no danger of the MAJESTY colliding with the NICHOLAS. As the MAJESTY approached the NICHOLAS, Stewart continued to believe that it was a safe overtaking and

could be accomplished. Although he had the right to do so, Stewart did not change the terms of the overtaking at any time. Stewart had encountered cruise ships on the river before and was aware that they could produce some wake.

10. After the MAJESTY overtook the NICHOLAS, Stewart claimed that the NICHOLAS experienced bow wake, "which wasn't bad." Stewart further claimed that the NICHOLAS then got into the stern wake, which he described as "at least 2 feet," but acknowledged he had no means to measure such. Notably, Stewart's post-incident U.S.C.G. 2692 form does not contain any estimate of the wake height. At first the stern wake did not have an effect on the NICHOLAS, but Stewart testified that the barge tow was pulled towards the middle of the river. He then steered back towards the east bank, which is when the starboard face wire broke.

11. Stewart was surprised when the starboard face wire broke and testified that the NICHOLAS and its tow "weren't bouncing that hard." Importantly, the NICHOLAS did not lose any gear overboard, did not lose any cargo from its barge tow, did not have any crewmember slip and fall, there were no injuries onboard due to the wake, and the NICHOLAS did not heel over. Moreover, Stewart did not place any radio calls to the MAJESTY advising of the purported wake. Stewart later informed Quinn that a cruise ship passed and its wake caused the NICHOLAS and its barge tow to rock, which found a "weak spot" in the forward lead of the starboard face wire, which in turn caused the face wire to break.

12. Stewart then purposefully broke the port face wire, in order to avoid the NICHOLAS being dragged. At 8:53 am, Stewart announced over the radio that his face wires had parted. Notably, the NICHOLAS had two prior incidents on the Red River and Tennessee River involving parted face wire while pushing loaded barges.

13. At the same time, Turn deckhand, and claimant herein, Trey Wooley was working on the M/V ASSAULT, which services Turn's Meraux barge fleeting facility on the Mississippi River just downriver from downtown New Orleans. Working along with Wooley on the ASSAULT were Captain Ernie Untereiner, Deckhandds Shane Falgout and Bradley Bordeaux.

14. Following the radio call by Stewart for assistance on the NICHOLAS, Captain Untereiner made the decision to proceed to the NICHOLAS to assist the crew in re-securing the vessel and its tow. Captain Untereiner instructed Wooley, Falgout, and Bordeaux to be careful and assist in getting the face wires replaced on the NICHOLAS.

15. Upon boarding the vessel, it was clear to claimant, Falgout, and Bordeaux that the crew aboard the NICHOLAS was inadequate for the task. The M/V NICHOLAS' lead deckhand, Michael Quinn, failed to do a JSA or establish any sense of control over the situation, including establishing a means of radio communication between the two crews. In fact, the testimony and evidence established that nobody on the N&W crew conducted a JSA.

16. Additionally, Quinn testified that a "lockout / tag out" procedure had been initiated. In such a procedure, the remote controls to the individual winches would have been locked, such that the only person who could operate and control the winch would be the person

physically working on the winch (such as Wooley). Quinn's testimony was directly contradicted by the other witnesses, including Mate/Pilot Stewart, who testified no lockout / tag out order had ever been called or initiated.

17. Wooley was assigned to work on the starboard winch. While Wooley was working on the starboard winch, Mate/Pilot Stewart was working in the wheelhouse. From the wheelhouse, Stewart could not see Wooley or his position relative to the winch. As Wooley worked on replacing the face wire and tightened the clamp, Mate/Pilot Stewart turned on the starboard winch causing Trey's hand to became crushed. Trey quickly passed out and only remembered passing details of the event; however, it is clear to the Court from the testimony of all of the witnesses that Wooley did not, nor would a reasonable person order the winch to be turned on while their hand was in the winch.

18. The Court now turns its attention to who turned on the winch, and why. According to the testimony of ASSAULT deckhand Shane Falgout, NICHOLAS deckhand Jessie Osby ordered the winch to be turned on. Mr. Osby made this call while standing near the port winch, and he did not indicate which side to operate. Captain Stewart admitted he turned on the starboard winch. He also testified he did not clarify which side it was, and he did not know who was on the radio telling him to bump the winch. It is clear to the Court he should have confirmed the correct winch before bumping it. While Stewart claimed that he heard "someone" on the radio (though he does not know who) give the go ahead to turn it on, all of the testimony was consistent that that the Turn Services crew was on a different radio channel from the NICHOLAS crew. Specifically, Captain Untereiner testified his vessel had three radios, two fixed and one portable. The radios were set on three different channels: channel 67 for vessel traffic, channel 66 was for fleet communication and channel 82 to communicate with his crew. The NICHOLAS had three radios in the wheelhouse. Channel 72 was used by Pilot/Mate Stewart to talk to his crew aboard the NICHOLAS. Channel 5 was for the New Orleans VTS, and the third channel was 67. Pilot/Mate Stewart testified that he switched the third radio to channel 68 to speak to the captain aboard the ASSAULT. Pilot/Mate Stewart testified he was on channel 68 when he received the message to "bump-the-winch". None of the Turn crew were on channel 68 at any time. As such, there is no way that someone from Turn Services, including Trey, gave the go ahead.

19. Indeed, as Plaintiff's marine safety expert, Commander Bob Borison explained at trial, Wooley had already lined up the nuts when he removed them from the U-bolt. As such, it makes no sense that he would give a command to bump the winch if the nuts were already lined up. Further, if Wooley's socket was on the nuts, there would be no reason for him to turn on the winch. It also stretches credulity how Wooley could operate the radio (to ostensibly order Pilot/Mate Stewart to bump the winch) while both of his hands were placed on the socket.

20. N&W's lead deckhand Quinn testified that he did not give the go ahead, and even went so far as saying that he ordered a lock out, tag out, which would have precluded Stewart from turning it on. Pilot/Mate Stewart disagreed with this, testifying no such order was given, but this does not require a weighing of credibility by the Court – whether the Court relies

upon the testimony of Quinn, Stewart, or Falgout, it is clear to the Court that Pilot/Mate Stewart should not have turned on the winch while Trey's hand was there.

21. The question inevitably arises as to what benefit a JSA or lockout/tag out procedure would have provided in the incident complained of. The Court identifies several. First, based on the testimony of the witnesses, it is undisputed that the crew of the NICHOLAS faced a serious situation with the broken facewire, one for which they were ill-trained and ill-repaired. Second, a JSA would have covered such topics as who would be responsible for what tasks, who would operate what equipment, who would be positioned at each winch, and who would be responsible for monitoring safety protocols, including whether and when to remotely operate the winches. Third, a lockout/tag out procedure would have limited the ability to operate the winch to the operators themselves; in this case, that would have been Wooley himself, who would presumably only have turned on the winch when it was safe to do so.

## II. RCCL's Role in Causing the Accident

22. RCCL filed Claims within the Limitation action filed by N&W, seeking tort contribution in the event RCCL were held to account for any damages claimed by Trey Wooley or any other claimant. N&W then filed a counterclaim against RCCL seeking tort contribution and other damages. All claims by, among, and between RCCL and any other party have been resolved prior to trial, and RCCL is not a party for any purpose other than as an "empty chair."

23. Despite N&W asserting RCCL's fault in starting the chain of events, this argument collapses when considered under the rubric of proximate cause, particularly given the timeline of events. The MAJESTY overtook the NICHOLAS at approximately 8:47am. According to Shane Falgout, the incident complained of occurred at approximately 11:00am. The passage of 1-2 hours creates serious doubts as to proximate cause for the overtaking of the NICHOLAS leading to, or even contributing to, the incident complained of.

24. The Court must take a moment to acknowledge that the exact time of the incident likely cannot be ascertained. Yet even beyond the temporal disconnection is a more fundamental one. While the overtaking of the NICHOLAS by the MAJESTY could have caused the NICHOLAS's facewires to break, that issue is not before the Court as those claims have been compromised and settled. The issue before the Court is whether and to what extent the overtaking of the NICHOLAS by the MAJESTY caused the winch to be bumped. And the answer to this is a simple one: it did not. The decision to bump the winch was made by Pilot/Mate Stewart independent of the overtaking. There is not even an allegation that anyone from RCCL or the MAJESTY told Pilot/Mate Stewart to bump the winch.

25. Accordingly, RCCL cannot be held liable, in whole or in part, for the damages sustained by Claimant Wooley in this matter.

### III. Turn's Role in Causing the Accident

26. Following Mr. Wooley's injury on February 29, 2020, Turn paid maintenance and cure benefits to and on behalf of Wooley. Mr. Wooley did not assert any claims against Turn in this lawsuit, but N&W has tendered Turn to Wooley as a defendant pursuant to FED. R. CIV. P. 14(c).

27. The analysis of Turn's role in causing the accident closely tracks the analysis of RCCL's role. While it is true that Turn was significantly more involved, sending its personnel to the NICHOLAS (to assist it while in distress), the same proximate cause issue arises in N&W's efforts to apportion blame to the ASSAULT crew. There is no evidence anyone from the ASSAULT crew ordered the winch to be bumped while Wooley's hand was in it. Instead, all of the evidence and testimony unequivocally points to Pilot/Mate Stewart bumping the winch. By his own words, "someone" ordered him to bump "the winch." Not only did he not clarify who made the order, or which winch to bump, but he was not on the same radio channel as the crew of the ASSAULT.

28. Accordingly, liability falls squarely on N&W, with no proportional fault by Turn.

### IV. Damages suffered by Claimant, Trey Wooley (if applicable)

29. This section is only relevant and pertinent if the Court denies the pending Motion to Bifurcate.

30. As a result of the accident, Wooley suffered a crush injury to his left hand, requiring him to be carried from the scene because he passed in and out of consciousness after the accident. He was brought to the emergency room at University Medical Center where he was diagnosed with, *inter alia*, a crush injury, lacerations to his left hand, neuromas in continuity of left common digital nerve to ulnar index and radial long fingers, and traumatic compartment syndrome in his hand. These injuries required emergency laceration repair on February 29, 2020 with 6 sutures.

31. On March 1, 2020, he underwent a fasciotomy and compartment release to his left hand. The initial surgeries were performed by the on call reconstructive surgeon, but he has continually treated with Dr. Kelly Babineaux, who testified live at trial. Wooley had significant pain following surgery and was on IV pain medication. He was discharged on March 3, 2020. Trey followed up with the surgeons on March 6, 2021 and March 20, 2021. For the next 7 months, Trey underwent occupational therapy on 42 separate visits. After reviewing a positive EMG, Dr. Babineaux diagnosed crush injury with digital nerve damage, scar tethering, and carpal tunnel syndrome. Dr. Babineaux ordered Trey to undergo palm scar revision / z-plasty surgery, possible primary digital nerve repair vs. nerve conduit vs. allograft.

32. As of today, Plaintiff has undergone three complicated surgical procedures, and last week Dr. Babineaux confirmed that Trey will have permanent sensory deficits in his left hand. That is, he will not have feeling in his middle three fingers for the rest of his life. Moreover, he will have perpetual nerve pain, as evidenced that Dr. Babineaux could not testify when

Trey will be able to withdraw from taking Lyrica for his nerve pain. As a result of the accident, he is currently rated with a 23% impairment to his hand, 21% impairment to his upper extremity, and 12% impairment to his whole body based on the persistent sensory deficits. Due to this, he will be unable to do most manual labor, including being a deckhand, which Dr. Babineaux testified would be dangerous work given his lack of sensation in his hand.

33. Mr. Wooley also has very serious psychological injuries as a result of this accident, and he has been consistently treating with Dr. Beverly Howze over the past 1 ½ years for same. Dr. Howze also testified live at trial, and she has diagnosed Trey as having the following as a result of the accident: (1) Major depressive disorder, single episode; (2) PTSD; (3) Somatic Symptom Disorder, with Chronic Pain as a Significant Feature; and, (4) Generalized Anxiety Disorder. Her findings are supported by various psychological testing, and Dr. Howze's recommendations include long-term intensive psychotherapy - although Mr. Wooley has benefited from an approximate 1 year of treatment, his mental status is marginal and he is highly susceptible to stress reactions including suicide ideation. Medication management may be necessary down the road. Inpatient hospitalization cannot be ruled out. His prognosis is guarded. In sum, Trey's life has been in a downhill spiral since this accident. There was even a suicide attempt a few months ago where he grabbed a gun and took it into his car, threatening to shoot himself. Dr. Howze has therefore opined that she "cannot rule out suicidal ideation that may require hospitalization."

34. Lacy H. Sapp, Ph.D. testified live at trial as to the vocational outlook for Mr. Wooley as well as his future life care plan. She testified that based on his prior work history and earnings history, vocational test results, and vocational analysis, although he had been working as a deckhand, he will be unable to return to work as a deckhand. Additionally, his future goal of obtaining his captain's license and becoming a captain is foreclosed. Although N&W's counsel called this goal into question, it was amply supported by the testimony of Captain Untereiner, who testified that he would be quite capable of becoming a captain, absent his injuries. The Court found Captain Untereiner's testimony particularly persuasive, as he is a designated examiner for the Coast Guard and thereby provided the Court with a unique perspective as to Mr. Wooley's aptitude and abilities to advance to the eventual role of captain.

35. Dr. Sapp estimated Mr. Wooley's future medical expenses in the range of $184,584.87 - $280,190.67. Dr. Shael Wolfson testified the total present value of medical care costs range from $211,754.00 to $310,607.00 with a midpoint of $261,180.00.

36. In terms of the medical expenses incurred by Wooley, Wooley submitted as follows:

| Medical Provider | Dates of Treatment | Total Bills |
|---|---|---|
| Ochsner Medical Center – Westbank Campus | 2/29/2020 | $5,410.98 |
| Acadian Ambulance of New Orleans | 2/29/2020 | $1,660.64 |

| Medical Provider | Dates of Treatment | Total Bills |
|---|---|---|
| Kenner Emergency Group | 2/29/2020 | $2,238.00 |
| Ochsner Clinic LLC | 2/29/2020 | $40.00 |
| Belle Chasse Emergency Group | 2/29/2020 | $4868.00 |
| Ochsner Medical Center – Belle Chasse | 2/29/2020 | $3,705.14 |
| LSU Healthcare Network | 3/1/2020 – 6/8/2021 | $7,254.01 |
| University Medical Center | 3/1/2020 | $1,000.00 |
| University Medical Center - Radiology | 3/6/2020 | $600.00 |
| University Medical Center - NO | 3/6/2020 | $32,184.94 |
| University Medical Center - NO | 6/25/2020 | $1,400.00 |
| University Medical Center - NO | 6/25/2020 – 8/11/2020 | $62,007.89 |
| LCMC | 4/23/2021 | $4,832.00 |
| West Jefferson Medical Center Rehab Connection - Marrero | 3/31/2020 – 10/22/2020 | $25,918.00 |
| University Medical Center - NO | 3/20/2020 – 12/8/2020 | $2,116.00 |
| Beverly Howze, Ph.D. | 6/11/2021 – 6/16/2021 | $19,800.00 |
| Prescriptions from Walgreens | 3/3/2020 – 6/24/2021 | $439.09 |
| University Medical Center - NO | 6/8/2021 | $348.00 |
| **TOTAL:** | | **$175,474.69** |

37. Turn submitted a claim for $13,920.00 in maintenance and cure payments to Wooley, and $75,658.32 in medical payments made on Wooley's behalf. Turn is entitled to recoup its payments for maintenance and cure and medical charges from N&W, and Wooley is

entitled to recoup its medical expenses from N&W, less a credit for the medical payments made by Turn on Wooley's behalf.

38. As for lost wages, Dr. Wolfson testified that the loss of income through trial is $49,255.00 under a base of $39,315.00 for deckhand earnings. Assuming deckhand earnings for three years, entry level earnings for captains for three years, median earnings for 5 years, and experienced earnings thereafter, Dr. Wolfson calculated his future lost earnings as $2,643,915.00 without a return to work, or $2,135,993.00 with a return to work, incorporating his impairment differential. He calculated the value of future fringe benefits at $569,731.00.

**V. Valuation of Vessel (if applicable)**

39. The Court now considers the question of the value of the vessel, which is pertinent and relevant if the Court determines that N&W is entitled to a limitation in this proceeding.

40. The valuation report prepared by Norman Dufour assigned a fair market value of $3,230,000.00 for the NICHOLAS. While the Court found Mr. Dufour's analysis to be sound, this opinion, on its own, does not inform the Court as to the valuation of the NICHOLAS. Germane and dispositive to this Court's analysis is Exhibit 49, introduced into evidence by consent of all parties. Exhibit 49 consists of the Starr Indemnity & Liability Company Hull Policy for the NICHOLAS, wherein N&W applied for and obtained an insured value of $3,200,000.00 for the policy period of October 30, 2018 – April 30, 2020. The Court finds this action by N&W in particular to be the most likely and most accurate representation of the actual fair market value of the NICHOLAS.

41. Considering the testimony of Mr. Dufour (who was not initially retained by the Claimant) along with the insurance policy obtained by N&W for its vessel, the Court finds that the NICHOLAS's valuation is $3,200,000.00.

Respectfully submitted:
*Glago Williams, LLC*

/s/ Christopher G. Otten
**Mark P. Glago, Bar No. 25395**
**Jatavian L. Williams, Bar. No. 33431**
**Katherine E. May, Bar No. 32578**
**Christopher G. Otten, Bar No. 32626**
First Bank & Trust Tower - 29th Floor
909 Poydras Street
New Orleans, Louisiana 70112
Telephone: (504) 599-8666
Facsimile: (504) 599-8699
mglago@glagowilliams.com
jwilliams@glagowilliams.com
kmay@glagowilliams.com
cotten@glagowilliams.com
**Attorneys for the Claimant, Trey Wooley**

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2021 a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

/s/ Christopher G. Otten
Christopher G. Otten